# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| LUPO, LLC, d/b/a PRIME TOYOTA, ET AL., | )<br>)<br>) |
| Plaintiffs, | )<br>) Docket no. 10-cv-59-GZS |
| v. | )<br>) |
| THE REYNOLDS AND REYNOLDS COMPANY, | )<br>)<br>) |
| Defendant. | |

## ORDER ON MOTION TO STAY PROCEEDINGS
## AND COMPEL ARBITRATION

Before the Court is the Motion to Stay Proceedings and Compel Arbitration with Incorporated Memorandum of Law (Docket # 15) by Defendant The Reynolds and Reynolds Company. As explained herein, the Court GRANTS Defendant's Motion.

**I.      BACKGROUND**

For purposes of deciding this motion, the Court will not address the merits of—and therefore need not detail the specifics of—the dispute between the parties. Of relevance here, Plaintiffs Lupo, LLC d/b/a/ Prime Toyota, Bensol, LLC d/b/a/ Prime Nissan, Staretz, LLC d/b/a Prime Hyundai and Sawdran, LLC d/b/a Prime Motor Cars (collectively "Prime"), four car dealerships located in Maine,[1] entered into contracts in 2004 with Defendant The Reynolds and Reynolds Company ("Reynolds"), an Ohio-based provider of computer systems and related equipment to car dealerships throughout the United States. In the spring of 2009, Prime sent letters to Reynolds seeking to terminate this business relationship due to dissatisfaction with the services provided. Reynolds subsequently demanded that Prime pay $174,573.97, representing

---

[1] According to Prime's Complaint, the four Plaintiffs are Maine limited liability companies whose members are residents of Maine and Massachusetts. (Compl. (Docket # 1) at 2 n.1.)

the full total of the remaining monthly payments due for both the equipment purchased and an additional year of the cancelled services. Prime refused to pay, and after settlement discussions failed, this lawsuit ensued.

Specifically, Prime brings a four part complaint against Reynolds asserting claims for declaratory judgment (Count I), breach of contract (Count II), fraudulent misrepresentation (Count III) and negligent misrepresentation (Count IV). (Compl. (Docket # 1) ¶¶32-54.) Plaintiffs ask the Court to declare pursuant to 28 U.S.C. § 2201 that Prime owes no further payments to Reynolds and that the early termination fee provisions in the contracts between the parties are unenforceable, and to award damages in an amount to be determined at trial, together with interest, costs, attorney's fees and other relief deemed just and proper. (Compl. at 9-10.) Reynolds responded with a three part counterclaim against Prime, asserting breach of contract (Count I), unjust enrichment (Count II) and quantum meruit (Count III) and asking the Court to award Reynolds damages, attorney's fees, and any other relief deemed just and appropriate. (Def.'s Answer & Counterclaim (Docket # 7) at 9-11.)

In its motion to compel arbitration, Reynolds asserts that Prime signed contracts that require Plaintiffs to arbitrate all of the above-referenced claims and counterclaims. The business relationships between Reynolds and its car dealership customers, including Prime, are governed by a written adhesion contract comprised of five integrated documents (the "Contract").[2] The arbitration provision of the Contract between the parties provides that:

> Any disputes between us related directly or indirectly to an Order will be settled by binding arbitration (except for disputes involving your failure to pay amounts due to us or violation of any proprietary rights of Other Providers or us) under the American Arbitration Association Rules except as specifically stated herein. It does not matter whether the controversy is based on contract, tort, strict liability or other legal theory.

---

[2] The Contract consists of: (1) the Purchase Order for the specific item or service the car dealership purchased from Reynolds; (2) the Authorization Letter; (3) the Master Agreement; (4) the Defined Terms; (5) and the then-current Customer Guide. (Dunaway Decl. (Docket # 15-1) & Exs. A-K (Docket #s 15-2 to 15-12).)

(Dunaway Decl. at ¶13; Ex. I (Docket # 15-10) at 11; Ex. J (Docket # 15-11) at 11; & Ex. K (Docket # 15-12) at 11.) Prime objects on the ground that these claims fall outside the scope of the arbitration agreement between the parties. (Pls.' Opp'n to Def.'s Mot. ("Pls.' Opp'n") (Docket # 18) at 1-2.)

**II.     LEGAL STANDARD & ANALYSIS**

The Federal Arbitration Act (the "FAA"), 9 U.S.C. §1 *et seq.*, applies to all arbitration agreements involving interstate commerce.[3] Section 2 of the FAA guarantees that:

> A written provision in any … contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. The FAA provides a mechanism by which a party can request a court to stay a judicial proceeding when the matter before the court involves an issue governed by an agreement to arbitrate and likewise allows a party aggrieved by another party's refusal to arbitrate to petition a district court to compel arbitration in accordance with the parties' preexisting agreement. 9 U.S.C. §§ 3-4.

"Arbitration is a matter of contract." PowerShare, Inc. v. Syntel, Inc., 597 F.3d 10, 15 (1st Cir. 2010) (citing First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 943 (1995)).[4] "When deciding a motion to compel arbitration, a court must determine whether (i) there exists a written agreement to arbitrate, (ii) the dispute falls within the scope of that arbitration agreement, and

---

[3] There does not appear to be any dispute that the contracts at issue here, which involve the purchase and sale of items and services between companies in different states, involve interstate commerce. See also Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 401 n.7 (1967) (noting that the FAA contemplates a broader definition for interstate commerce than mere interstate shipment of goods).

[4] The Court looks to state law in matters of contract interpretation. See First Options, 514 U.S. at 944 ("When deciding whether the parties agreed to arbitrate a certain matter …, courts generally … should apply ordinary state-law principles that govern the formation of contracts."). The Contract between the parties contains a choice-of-law provision in favor of the laws of the state of Ohio. (Def.'s Ex. H (Docket # 15-9) ¶7(h) ("This Agreement shall be governed by and construed in accordance with the internal laws of the State of Ohio, without regard to its principles of conflicts of laws.")).

3

(iii) the party seeking an arbitral forum has not waived its right to arbitration." Combined Energies v. CCI, Inc., 514 F.3d 168, 171 (1st Cir. 2008) (citation and internal punctuation omitted); see also Intergen N.V. v. Grina, 344 F.3d 134, 142 (1st Cir. 2003) ("A party who attempts to compel arbitration must show that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope."). "The need for such a showing follows from the bedrock principle that a party seeking to substitute an arbitral forum for a judicial forum must show, at a bare minimum, that the protagonists have agreed to arbitrate *some* claims." Campbell v. Gen. Dynamics Gov't Sys. Corp., 407 F.3d 546, 552 (1st Cir. 2005) (citation and internal punctuation omitted).

As recognized by both parties, the FAA "undeniably" embodies a liberal federal policy favoring arbitration. PowerShare, 597 F.3d at 15; see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983) ("[Q]uestions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration."). "At a minimum, this policy requires that 'ambiguities as to the scope of the arbitration clause itself [must be] resolved in favor of arbitration.'" PowerShare, 597 F.3d at 15 (citing Volt Info. Scis., Inc. v. Bd. Of Trs. of Leland Stanford Jr. Univ., 489 U.S. 468, 475-76 (1989)); see also Brennan v. King, 139 F.3d 258, 264 (1st Cir. 1998) (noting that this policy favoring arbitration applies "whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.").[5] Of course, "the federal policy favoring arbitration is not a free-standing ground upon which to remit parties to arbitration, but one that informs the

---

[5] Ohio law—just like federal common law and the FAA—favors and encourages arbitration. See, e.g., Hudson v. Ernst & Young, L.L.P., No. 09AP-949, 2010 WL 2396274, at *2 (Ohio Ct. App. June 15, 2010) (noting this "modern trend in the law"); Worldwide Asset Purchasing, L.L.C. v. Easterling, 928 N.E.2d 1148, 1150 (Ohio Ct. App. 2009) ("And with limited exceptions, courts will uphold an arbitration clause just as any other contractual provision.") (citing Williams v. Aetna Fin. Co., 700 N.E.2d 859, 865 (Ohio 1998)).

4

court's interpretation." Id. at 266 n.8. What is more, with adhesion contracts[6] such as the one at issue here, any doubt or ambiguity in the language of the contract is to be construed against the drafter. See, e.g., Worldwide Asset Purchasing, L.L.C. v. Easterling, 928 N.E.2d 1148, 1150 (Ohio Ct. App. 2009) ("The presumption favoring arbitration, however, does not trump all other principles of law or equity. For example, situations where the parties' agreement appears to be an adhesion contract will substantially weaken the presumption favoring arbitration.") (citations omitted).

### A. *The Scope of the Arbitration Agreement*

Prime does not dispute that the Contract between the parties contain a valid arbitration provision. Instead, Prime contends that the arbitration clause cannot be read fairly to encompass the current claims. Specifically, Prime asserts that it is not bound by this agreed-to provision because "this dispute falls squarely within" the plain language of one of the two specified exceptions to arbitration—*i.e.*, each count boils down to a dispute over their "failure to pay amounts due to" Reynolds. (Pls.' Opp'n at 2.) In furtherance of their argument, Prime states that they are willing to stipulate to limiting all requested relief to only amounts due under the parties' Contract.

It is undoubtedly true that "[w]here the parties to an arbitration agreement specifically have excepted a certain type of claim from mandatory arbitration, it is the duty of courts to enforce not only the full breadth of the arbitration clause, but its limitations as well." Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp., 246 F.3d 219, 226 (2d Cir. 2001) (emphasis and citation omitted); see also Combined Energies, 514 F.3d at 172 ("Precedent may counsel us to construe arbitration clauses liberally, but it does not permit us to read out of an

---

[6] Adhesion contracts are "standardized agreements offered to consumers on an essentially 'take it or leave it' basis, wherein the buyer has no realistic choice as to its terms." Winters v. Hart, 832 N.E.2d 753, 755 (Ohio 2005) (citing Black's Law Dictionary 342 (8th Ed. 1999)).

5

arbitration clause an explicit limit upon the scope of that clause that has been agreed to by both parties."). Still, the Court believes that Defendant has the better of the argument. It is clear that the parties—both sophisticated business entities—entered into a valid agreement to arbitrate claims such as those brought by both parties in this case. The Contracts' broad mandatory arbitration clause makes explicit that it applies to "any dispute" regardless of whether that dispute "is based on contract, tort, strict liability or other legal theory." (Def.'s Exs. I-L at 11.) Given the breadth of this mandatory arbitration provision, the most sensible reading of the exception to the mandatory arbitration clause is that it was intended to apply narrowly to the simple uncontested collection action—that is, where the customer's liability for a sum certain is not in question but the customer is delinquent in paying this amount to Reynolds.

Here, Prime's claims do not arise out of a simple failure to pay Reynolds "amounts due to it." Rather, based on their professed complete dissatisfaction with the services provided, Prime asserts through its lawsuit that they owe Reynolds no additional money. See Compl. ¶33 ("A dispute exists between Prime and Reynolds regarding Reynolds' ability to collect fees and charges for services it never performed."); id. ¶35 ("The $174,573.97 amount that Reynolds demands from Prime does not reasonably forecast or estimate Reynolds' losses as a result of Prime terminating the [Contract] and the demand would be a windfall for Reynolds because it did not provide the services and products that the demand represents."); id ¶36 (seeking judicial declarations that the early termination provisions are "unenforceable, invalid, and illegal" and that "Prime owes no additional monies to Reynolds"). This conclusion is underscored by the fact that, in addition to asking the Court for a declaratory judgment that Prime owes no additional monies to Reynolds, Prime alleges that Reynolds breached its Contract by failing to provide the products and services as it promised it would (Count II); intentionally misrepresented material information regarding the implementation of its products and services under the parties'

6

agreements and that it relied on those misrepresentations when it entered into the Contracts (Count III); and negligently failed to communicate material facts to Prime regarding implementation of its products and services, upon which Prime relied in entering the Contracts (Count IV). Id. ¶¶37-54.

Convenient stipulations aside, these contract and tort claims—legal theories explicitly denoted as arbitrable in the mandatory arbitration clause—cannot logically be reduced down to a mere "failure to pay amounts due to" Reynolds.[7] A party "cannot avoid arbitration by dint of artful pleading alone." Combined Energies, 514 F.3d at 172 (affirming district court's finding that the plaintiff's claims did not fall within the scope of the parties' arbitration agreement given that the claims could not be said to arise out of, or relate to, the matters covered by the agreement to arbitrate.) For, if Prime's interpretation were to prevail, the exception essentially would swallow the rule. In so finding, the Court is "mindful that an interpretation which gives effect to all the terms of a contract is preferable to one that harps on isolated provisions, heedless of context," and that, accordingly, it is to "strive for a reasonable interpretation of the [Contract] as a whole, while avoiding constructions that would render any term within it meaningless." PowerShare, Inc., 597 F.3d at 16 (citations and internal punctuation omitted); see also State v. Bethel, 854 N.E.2d 150 (Ohio 2006) (citing as a "basic principle of contract law" that "[i]n the construction of a contract courts should give effect, if possible, to *every* provision therein contained, and if one construction of a doubtful condition written in a contract would make that condition meaningless, and it is possible to give it another construction that would give it meaning and purpose, then the latter construction *must* obtain") (quoting Farmers Nat'l Bank v. Delaware Ins. Co., 94 N.E. 834, 839 (Ohio 1911)).

---

[7] Reynolds' counterclaims of breach of contract, unjust enrichment and quantum meruit likewise do not fall within the narrow exception to the mandatory arbitration agreement.

7

### B. Consideration of Extrinsic Evidence

In a variation of an argument that Reynolds has waived its right to proceed in an arbitral forum, Prime alternatively cites Reynolds behavior in unrelated cases as evidence that the case at hand falls outside the scope of the arbitration agreement. Specifically, Prime points to the fact that Reynolds has in other cases filed court actions over disputed debts. (Pls.' Opp'n at 2, 8-10.) This argument likewise has no merit.

First, the contractual language here is not ambiguous. As such, there is no need for the Court to look to extrinsic evidence regarding the parties' intent. See, e.g., City Life Dev., Inc. v. The Praxus Group, Inc., No. 88221, 2007 WL 1290169, at *4 (Oh. Ct. App. May 3, 2007) ("Only when the language of a contract is unclear or ambiguous … will extrinsic evidence be considered in an effort to give effect to the parties' intentions.") (citation omitted). However, even if the court were to consider such evidence, Prime's argument still fails. For, the fact that Reynolds has brought lawsuits seeking to recover sums owed to it that were not paid by customers only provides further evidence that the narrow exception to the mandatory arbitration agreement covers uncontested collection actions. Instead of demonstrating inconsistent conduct by Reynolds, this extrinsic evidence actually provides support that the language of the exclusion was intended to apply to claims where the amounts owed are not in dispute—which is not the case here.

## III. CONCLUSION

For the reasons explained herein, the Court finds that the mandatory arbitration clause in the Contracts between the parties encompasses this lawsuit. Accordingly, without reaching the merits of the dispute between the parties, the Court concludes that the dispute is subject to arbitration and hereby GRANTS Defendant's Motion to Compel.

Having determined that "all of the issues before the court are arbitrable," the Court has the discretion to either stay the proceedings or dismiss the entire action. Bercovitch v. Baldwin Sch., Inc., 133 F.3d 141, 156 n.21 (1st Cir. 1998); see also Buteau v. Affiliated Computer Servs., Inc., No. 09-cv-492, 2009 WL 4728919 (D. Me. Dec. 3, 2009). Defendant's Motion explicitly asks for a stay and is silent on dismissal. Nonetheless, having reviewed the entire docket and in an exercise of its discretion, the Court concludes that a dismissal without prejudice is in the best interest of the parties and overall judicial economy. Therefore, the Court hereby DISMISSES WITHOUT PREJUDICE Plaintiffs' Complaint (Docket #1) and Defendant's Counterclaim (Docket # 7).

    SO ORDERED.

    /s/ George Z. Singal
    United States District Judge

Dated this 22nd day of July, 2010.